UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

===========================================================X

VINCENT SAYLES,                                    :

                          Plaintiff,               :

          - against -                              :

CAROLYN COLVIN,                                    :
Acting Commissioner of Social Security,

                                                   :

                          Defendant.
-----------------------------------------------------------x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 8/28/14

**REPORT AND
RECOMMENDATION
TO THE HONORABLE
RICHARD J. SULLIVAN**

13cv6129-RJS-FM

**FRANK MAAS**, United States Magistrate Judge.

Plaintiff Vincent Sayles ("Sayles") brings this action pursuant to Section

205(g) of the Social Security Act ("Act"), 42 U.S.C. § 405(g), seeking review of a final

decision of the Commissioner of the Social Security Administration ("Commissioner")

denying his application for disability insurance benefits ("DIB"). The parties have filed

cross-motions for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules

of Civil Procedure. Because I find that the ALJ failed to make a determination as to

Sayles' ability to stoop or his need to alternate between sitting and standing and that such

findings have bearing on the Step Five determination, the Commissioner's motion, (ECF

No. 15), should be denied, and Sayles' motion, (ECF No. 17), should be granted. The

case therefore should be remanded pursuant to the fourth sentence of 42 U.S.C. § 405(g).

1

I.        Procedural Background

On November 3, 2009, Sayles filed an application for a period of disability and DIB beginning on September 14, 2007, the date he allegedly became disabled. Sayles alleged that he was unable to work because he suffered from Lyme disease, hypertension, asthma, an injury to his left knee, and difficulties with vision.  (Tr. 125-27, 139).[1]  Sayles' application was denied initially on March 9, 2010.  (Id. at 68-75).  His counsel subsequently requested a hearing before an administrative law judge ("ALJ"), which was held on July 21, 2011, before ALJ Robert Gonzalez.  (Id. at 31-62; 76-77). Sayles was the only witness to testify.  Thereafter, on December 5, 2011, the ALJ issued a written decision concluding that Sayles was not disabled within the meaning of the Act. (Id. at 12-29).  The Appeals Council subsequently denied Sayles' request for review on January 30, 2012.  (Id. at 10).

On August 30, 2013, Sayles timely commenced this action seeking review of the Commissioner's denial of his claims.  (ECF No. 2).  After the case was referred to me to report and recommend, (ECF No. 6), the Commissioner filed an answer on November 25, 2013, (ECF No. 7), followed by a motion for judgment on the pleadings on March 4, 2014, (ECF No. 15).  Sayles, in turn, filed his own motion for judgment on the pleadings on March 17, 2014.  (ECF No. 17).

―――――――――――――

[1]        Citations to "Tr." refer to the certified copy of the administrative record filed with the answer.  (ECF No. 8).

The issues presented by both motions are whether the ALJ's determination that Sayles was not disabled within the meaning of the Act is legally correct and supported by substantial evidence.

II.   <u>Factual Background</u>

   A.   <u>Non-Medical Evidence</u>

Sayles was born on February 12, 1965, and was forty-six years old at the time of his hearing.  (Tr. 24).  Sayles was married and had two sons.  (<u>Id.</u> at 46, 125-26).  After completing high school, he worked for more than twenty years as an auto mechanic.  (<u>Id.</u> at 140, 144).  This work required him to lift fifty pounds or more frequently, and one hundred pounds or more occasionally.  (<u>Id.</u> at 140).  While working as a mechanic, he spent approximately eight hours per day walking, eleven hours per day standing, three hours per day climbing, stooping, kneeling, and crouching, and eight hours per day handling, grabbing, grasping, reaching, writing, typing, or handling small objects.  (<u>Id.</u>).

Sayles ceased working as an auto mechanic in June 2007 and then spent approximately three months as an armed guard for an armored carrier.  (<u>Id.</u> at 140).  Sayles testified that he made this change because his son was very sick and his auto mechanic work had at times required that he work late into the night.  (<u>Id.</u> at 43-44).  He stopped working in 2007 following an accident in his garage at home during which a transmission fell on his leg, "punctur[ing] through the knee."  (<u>Id.</u> at 36).  He told the ALJ that he did not see a specialist at the time because he did not have health insurance and

was afraid of surgery.  (Id. at 36, 49).  He also testified that a nurse practitioner affiliated with his treating physician attempted to "get [him] to see a specialist about the knee," but that "[s]he spoke to a couple people and nobody would want to do the surgery or any kind of surgery because they felt there was no outcome."  (Id. at 54).  Accordingly, Sayles' knee never was examined by any specialist.  (Id. at 54-55).

Sayles indicated that when he walked too long or bent over, "something [in his knee] move[d] to the point where it [came] out . . . 2-3 inches" on the right side of his knee.  (Id. at 48, 50).  He described the protrusion as "soft tissue," and reported being able to "rub it back and forth and push it back."  (Id. at 50).  He testified that this condition had persisted for approximately two years, and that it had been "getting worse."  (Id.).  He "always" used a cane to assist him with walking, but no doctor had prescribed the cane for him.  (Id. at 48).

Sayles worked briefly in 2008 driving a truck to plow snow, but stopped doing this work because he "got frustrated with what happened with [his] leg" and because it "just wasn't worth it" financially.  (Id. at 44-45).

Sayles testified that approximately one to two years prior to the hearing, he had become extremely ill and "couldn't get out of bed" as a result of Lyme disease.  (Id. at 38).  He believed that he had undergone treatment for the illness once with Dr. Carol Taylor, and again later with Dr. Barry Goldman.  The first treatment "didn't work," but

4

after the second his migraines reduced and he was able to function, although he continued to experience "muscle fatigue."  (Id. at 39).

Sayles indicated that he spent his time watching television, and that he had gained approximately 150 pounds since becoming ill, due to his medications.  (Id. at 43, 46).  He stated that, although his children had always spent time "with [him] with cars and motorcycles," he and they did not "do anything any longer" since he had "dropped off."  (Id. at 46-47).

Sayles stated that he could hold ten pounds, but could not walk while doing so.  He could sit for "a couple hours" at a time, but would have to get up to go to the bathroom often due to his medications.  (Id. at 55-56).

B.    Medical Evidence

1.    Physical Condition:  Treating Sources

a.    Dr. Ronald R. Coffey

Sayles visited Dr. Ronald R. Coffey for the first time on June 6, 2006.  (Id. at 208).  At that time, Sayles weight more than 350 pounds and his blood pressure was 136/90.  (Id.).  He complained of a lump on his right shin and right upper arm.  Dr. Coffey referred Sayles to physician's assistant Amy L. Wolff ("Wolff") of Orange Dermatology Associates, P.C.  Wolff examined Sayles on June 15, 2006, finding a "tan, rough plaque with a red base" on his right shin, which she determined was "most likely

an irritated Seborrheic Keratosis."[2]  (Id. at 215).  She removed the plaque with liquid

nitrogen cryotherapy.  Wolff also found "other scattered Seborrheic Keratoses," but did

not treat those because they did not appear to be inflamed.  (Id.).  Wolff determined that

the lump on Sayles' right arm was an epidermoid cyst that did not require treatment at

that time.

Sayles returned to Dr. Coffey on July 3, 2006.  (Id. at 207).  He reported

that he had not seen a dietician.  Sayles' blood pressure during that visit was 124/96.

(Id.).  His next visit with Dr. Coffey did not occur until nearly two years later, on May 28,

2008.  At that time, he weighed more than 400 pounds, and his blood pressure was

172/98.  (Id.).  Sayles sought to discuss a painful "bulge" in his mid-abdomen, and

desired a note that would allow him to forego wearing an automobile seatbelt.  (Id.).  Dr.

Coffey's final visit with Sayles was on June 17, 2008, at which time Sayles' blood

pressure was 150/100.  (Id. at 205).

b.    St. Luke's Cornwall Hospital

On October 22, 2008, Sayles presented at the emergency room of St. Luke's

Cornwall Hospital complaining that he was "unable to lie flat on [his] back at night"

because it caused "difficulty breathing."  (Id. at 430).  Sayles' lungs were clear bilaterally

---

[2]    Seborrheic keratoses are "superficial, benign, verrucous, often pigmented, greasy
lesions consisting of proliferating epidermal cells, resembling basal cells, enclosing horn cysts."
Stedman's Medical Dictionary (27th ed. 2000) ("Stedman's").

and he did not complain of acute shortness of breath.  Sayles left a few hours later without being treated.  (Id.).

        c.     <u>Dr. Carol Taylor</u>

Dr. Carol Taylor of New Windsor Family Medicine treated Sayles from 2008 through 2010.  On November 3, 2008, Sayles presented to Dr. Taylor complaining of "nasal congestion, post nasal drip, cough and wheezing," which he reportedly had been experiencing for three weeks.  (Id. at 252).  Dr. Taylor noted that Sayles was "morbidly obese."  (Id.).  Dr. Taylor took Sayles' blood pressure twice.  The first reading was 152/110, and the second was 160/102.  (Id.).  She prescribed Flonase, Claritin, and Proventil.  (Id.).  Sayles returned approximately two weeks later reporting that he had been feeling better until he developed "drenching sweats and moist cough" three to four nights earlier.  (Id. at 250).   Dr. Taylor prescribed a course of Biaxin, an antibiotic.  (Id.).  When Sayles returned two weeks later, he told Dr. Taylor that he had completed the course of antibiotics and was feeling better.  (Id. at 248).  Sayles visited Dr. Taylor again on March 27, 2009, complaining of allergies and hypertension.  (Id. at 246).  Dr. Taylor noted that Sayles' allergic symptoms were seasonal, and that his compliance with his hypertension medication was "poor" because he had been "taking med[ications] once daily instead of as recommended twice daily."  (Id.).  By April 10, 2009, Sayles' compliance with his hypertension medication was "good."  (Id. at 244).  He was taking two medications for his high blood pressure:  Metoprolol and Lisinopril.  (Id.).

Sayles returned to Dr. Taylor on May 29, 2009, complaining of hypertension and pain on the left side of his neck as well as sleeping problems. (Id. at 240). His wife reported that he "stop[ped] breathing during sleep." (Id.). Dr. Taylor referred Sayles for a sleep study and increased his dosage of Lisinopril. (Id. at 241). Sayles also reported anxiety, so Dr. Taylor prescribed Cymbalta. (Id. at 240-41).

On July 10, 2009, Sayles returned to Dr. Taylor complaining of chest pain. According to Dr. Taylor, Sayles' symptoms were "alleviated by medications" and were mildly severe. (Id. at 236). Sayles continued to report anxiety, so Dr. Taylor added Wellbutrin to Sayles' regimen. (Id. at 237). During a visit on July 24, 2009, Sayles reported that he had stopped taking the Wellbutrin after one dose because it caused dizziness. (Id. at 234). He had lost two pounds. (Id.).

On October 15, 2009, Sayles visited Dr. Taylor complaining of migraine headaches that were not relieved by extra strength Tylenol. (Id. at 230). Dr. Taylor concluded that the headaches were due to Sayles' "uncontrolled blood pressure." (Id. at 231). She therefore increased his dosage of Lisinopril. (Id.). Upon re-evaluation later that week, Dr. Taylor noted that Sayles' headaches were "less frequent and less intense." (Id. at 228). On October 22, 2009, however, Sayles again complained of headaches and noted that they had not improved. Dr. Taylor sent Sayles for an MRI of his brain, and made a note to consider whether Sayles had Lyme disease. (Id. at 226-27).

On October 22, 2009, Orange Radiology Associates, P.C. performed the requested MRI.  The radiologist reviewed the images and reported that Sayles' ventricles were "of normal size."  There was "no evidence of abnormal signal intensity or mass effect," nor were there any "extra-axial collections" or "congenital anomalies."  (Id. at 494).  Sayles' sinuses appeared normal, although Dr. Ayers noted "some tortuosity of the basal artery."[3]  In the radiologist's view, the study was normal.  (Id.).

On November 6, 2009, Sayles returned to Dr. Taylor's office complaining of constant pain throughout his entire body.  (Id. at 224).  Dr. Taylor diagnosed Sayles with Lyme disease.  (Id.).  She noted that he was "slow to rise from [a] seated position due to stiffness."  (Id.).  She prescribed two antibiotics, Doxycycline Hyclate and Augmentin.  (Id.).

Sayles returned to Dr. Taylor on December 4, 2009, reporting that he had completed the course of Lyme disease medication the day prior.  He continued to experience neck stiffness and felt he had gained weight.  He reported experiencing depression and stated that he had not returned to work since he began the course of antibiotics.  (Id. at 220).  Dr. Taylor re-started Sayles on Wellbutrin.  (Id. at 221).

On December 18, 2009, Dr. Taylor reported that Sayles was compliant with his medications.  His blood pressure was 134/90.  When Sayles returned on January 5,

---

[3]     Tortuosity of an artery "arises from abnormal elongation of the arteries; since the end points of the arteries are fixed, the extra length twists and curves."  Genetics Home Reference, Arterial Tortuosity Syndrome, http://ghr.nlm.nih.gov/condition/arterial-tortuosity-syndrome (last visited Aug. 27, 2014).

2010, he reported having lost twelve pounds after "aggressively" modifying his diet.  (Id. at 335).  His blood pressure remained elevated.  One month later, on March 4, 2010, Sayles' compliance with his medication was "poor" and he had not complied with a diabetic diet.  (Id. at 331).  He had not lost any additional weight.  Sayles complained of periodic muscle spasms in his neck.  (Id.).

On March 18, 2010, Dr. Philip S. Smith, who apparently is an infectious disease specialist, examined Sayles.  Sayles reported to Dr. Smith that he had begun experiencing daily headaches in late December 2009.  He described the headaches as migraines marked by "stabbing" pain, and indicated that they occurred at the back of his head.  (Id. at 407).  Dr. Smith reviewed Sayles' bloodwork, which Dr. Taylor had provided.  Those records revealed a negative Lyme Enzyme Immunoassay ("EIA") test, a Lyme IgM Western blot which was positive in two bands, and an IgG Western blot which was positive at "a single 41 band."  (Id.).  Dr. Smith informed Sayles that it is difficult to know "who does or does not have Lyme disease."  (Id.).  In his view, the antibiotic course that Sayles underwent "should have successfully treated early Lyme disease."  (Id. at 408).  He opined, however, that Sayles "very likely d[id] not [have] Lyme disease."  (Id.). Dr. Smith noted that, in his experience, blood tests like Sayles' often were "false positive[s]."  He noted that his theory could be confirmed "by following the IgG and IgM Western blots over a several-month period of time."  (Id.).  Dr. Smith also noted that Sayles' symptoms seemed "disparate . . . rather than global," which he considered

consistent with a false positive.  (Id.).  Dr. Smith declined to prescribe further antibiotic

treatment.  He also noted that Sayles was a "very busy person," and that he was

"physically active, and involved in car repairs and . . . with his children and their

activities."  (Id.).

d.  <u>Goldman Family Medicine</u>

Sayles began treatment with Goldman Family Medicine in 2010.

On July 16, 2010, Dr. Barry Goldman sent Sayles' blood for testing.  The

results revealed a positive EIA test, and the presence of three "Borrelia-specific bands"[4]

of antigens on the Western Blot test.  (Id. at 451-53).

On February 9, 2011, Sayles saw Nurse Practitioner ("NP") Michele

Goldman, and complained of eye irritation.  His blood pressure was 138/94.  (Id. at 482).

On April 14, 2011, Sayles returned to NP Goldman for a follow-up examination.  He

reported that the eye irritation has subsided.  Sayles requested a handicap permit because

he was "unable to wear [a] seat belt."  (Id. at 481).  Sayles also complained of left knee

pain.  (Id.).  His blood pressure was 134/80.  (Id.).

On May 10, 2011, Sayles returned to NP Goldman for a follow-up visit.

His blood pressure was 108/64.  (Id. at 480).  Sayles reported experiencing anxiety,

depression, mood changes, and an increased stress level.  (Id.).  On May 31, 2011, Sayles

again reported anxiety and depression.  (Id. at 478).  He also complained of

---

[4]     "Borrelia burgdorferi" is "a bacterial species causing Lyme disease in humans."
<u>Stedman's</u>.

musculoskeletal pain and stiffness.  NP Goldman noted that Sayles' thyroid was "supple," but that his lungs showed signs of wheezing, rhonchi, and coughing.  She also noted decreased range of motion in Sayles' knees, indicating degenerative joint disease, with the left knee exhibiting more symptoms than the right.  (Id.)

Dr. Goldman completed a Medical Source Statement of Ability to Do Work-Related Activities (Physical) for Sayles on July 7, 2011.  (Id. at 435-40).  Dr. Goldman reported that Sayles could "continuously" lift and carry up to ten pounds, but could never lift or carry more weight.  (Id. at 435).  He opined that Sayles could sit for two hours and walk or stand for ten minutes without interruption and could sit for up to six hours and walk or stand for one hour in an eight-hour work day, but that he would need a "combination of sitting [and] standing for short intervals."  (Id. at 436).  Dr. Goldman noted that Sayles had needed to use a cane to walk for the past three years, and could walk only ten to twenty feet without it.  Dr. Goldman confirmed that Sayles' use of the cane was "medically necessary," and that he needed it for balance because of pain in his left knee.  (Id.).  In support of his determinations, Dr. Goldman cited Sayles' diagnoses of morbid obesity, asthma, Diabetes II uncontrolled, hypertension, and left knee pain.  (Id.).

Dr. Goldman opined that Sayles could occasionally operate foot controls, reach, and finger, could frequently handle or feel, and could never push or pull.  (Id. at 437).  In his view, Sayles could occasionally climb stairs or ramps and balance, but these

activities would have to be done slowly, as Sayles was "very limited."  In addition, Sayles could only perform these activities for less than one hour out of eight.  (Id. at 438).  Dr. Goldman believed that Sayles could never climb ladders or scaffolds, stoop, kneel, crouch or crawl.  (Id.).  In addition, Dr. Goldman opined that Sayles could never be exposed to unprotected heights, humidity or wetness, dust, odors, fumes and pulmonary irritants, or extreme cold or heat.  He believed that Sayles could tolerate occasional exposure to vibrations and moderate noise levels, and could occasionally work with moving mechanical parts and operate motor vehicles.  (Id. at 439).

2.        Physical Condition:  Consulting Source

On February 1, 2010, Dr. Leena Philip performed an internal medicine examination of Sayles following a referral from the Division of Disability Determination. (Id. at 272).  Dr. Philip noted that Sayles' chief complaint was asthma.  (Id.).  Sayles reported that he had been diagnosed in 2006, but had experienced symptoms since childhood.  His last exacerbation had occurred two days prior to the examination.  (Id.). He reported that he never had been hospitalized for asthma, but had gone to the emergency room once in 2001 for an attack.  He told Dr. Philip that he used a nebulizer at home when needed.  (Id.).

Sayles also complained of left knee pain, which he reported experiencing for seven years and attributed to the incident in which he dropped a transmission on his knee.  (Id.).  He described the pain as "sharp" and "intermittent" and noted that it

"worsened with prolonged sitting and standing," but improved with use of Aleve and codeine. (Id.). He informed Dr. Philip that he had received no treatment and had undergone no x-rays of his knee.

Sayles reported that he was "unable to cook, clean, do laundry, or shop due to left knee pain," but that he was able to shower, bathe, and dress himself, and enjoyed watching television and reading. (Id. at 273). He weighed 415 pounds and his blood pressure was 144/86. (Id. at 273). Dr. Philip noted that Sayles walked with a "limp to the right" and "defer[red] to walk on heels and toes [and] to squat." (Id.). Sayles did not use any assistive devices, and did not need help changing for the examination or getting on or off the examination table. He was "able to rise from [a] chair without difficulty." (Id.).

Dr. Philip performed a straight-leg raising test, which yielded positive results "due to left knee pain to 10 degrees" in the supine position. (Id. at 274). The same test was negative in the sitting position on the left side and in both positions on the right side. Sayles had decreased range of motion of his left knee, with flexion limited to eighty degrees. He had full extension on both sides. Although his strength was 5/5 in his upper extremities and right leg, it was 4/5 in his left leg. Sayles had tenderness in his left knee, but Dr. Philip saw no "redness, heat, swelling, or effusion" or evidence of a specific "trigger point." (Id.). Although Dr. Philip ordered an x-ray of Sayles' left knee, the procedure was not performed because Sayles' weight "exceed[ed] [the] table limit." (Id. at 275).

14

Dr. Philip also performed pre- and post-medication pulmonary function tests. Prior to medication, Sayles' $FEV_1$ was 66%, his FVC was 86%, and his $FEV_1$/FVC was 64%.[5] After medication, his $FEV_1$ improved to 77%, his FVC to 89%, and his $FEV_1$/FVC to 70%. (Id.). Dr. Philip described the findings as revealing a "moderate obstruction." (Id.). Dr. Philip noted, however, that the study was "very limited" because Sayles was "coughing throughout the exam." (Id.).

Dr. Philip opined that Sayles had "moderate limitations to climbing stairs, kneeling, squatting, walking long distances, and prolonged standing due to left knee pain." (Id.).

### 3.   Mental Condition

#### a.   Dr. Leslie Helprin

On February 11, 2010, psychologist Dr. Leslie Helprin performed a consultative psychiatric examination of Sayles. (Id. at 283-86). Sayles reported that he had received no past or current psychiatric treatment, but had a history of seizures, with the last episode occurring three weeks prior to the examination. He had difficulty falling asleep and awakened six times per night. He informed Dr. Helprin that he had gained approximately 120 pounds over the previous year, and she noted that he appeared

---

[5]     "FEV" is the "[a]bbreviation for forced expiratory volume, with subscript indicating time interval in seconds." "FVC" is the "[a]bbreviation for forced vital capacity," which is "measured with the subject exhaling as rapidly as possible." The test reveals "data relating [to] volume, expiratory flow, and time," which then "form[s] the basis for other pulmonary function tests, e.g., flow-volume curve, forced expiratory volume, forced expiratory time, forced expiratory flow." Stedman's.

"grossly obese." (<u>Id.</u> at 284).  Sayles reported that he had a fear of surgery and death and became depressed when thinking of these ideas.  He also noted "'a little' short-term memory difficulty at times." (<u>Id.</u>).  Dr. Helprin described Sayles as cooperative during the examination, and noted that his manner of relating, social skills, and presentation all were "adequate."  He appeared well groomed and used a cane.  His gait, posture, and motor behavior all were normal.  Sayles' affect was "restricted" and his mood "neutral."  Dr. Helprin opined that his attention and concentration were "[i]mpaired due to cognitive limitations." (<u>Id.</u>).  She noted that although Sayles was able to count from one to ten forward and backward, he "could not do simple calculations nor serial 3s." (<u>Id.</u>).  Dr. Helprin also opined that Sayles' recent and remote memory skills were "[m]ildly impaired due to cognitive limitations."  He was able to recall three out of three objects immediately, but recalled none after a five minute delay. (<u>Id.</u> at 284-85).  He was able to repeat five digits forward and three backward. (<u>Id.</u> at 285).  Dr. Helprin placed Sayles' intellectual skills in "the below-average range," although his "fund of information" was appropriate to his experience. (<u>Id.</u>).

Sayles informed Dr. Helprin that he was able to dress, bathe, and groom himself, but that his wife did the cooking, cleaning, laundry, and food shopping because he was unable to stand for long periods of time due to his knee problem. (<u>Id.</u>).  Sayles' wife also managed his finances because he experienced "confusion."  His medications made him "sleepy."  He did not socialize with friends, but had "great" family

16

relationships.  He spent his time watching television, listening to music, reading, and attending doctor visits.  Dr. Helprin opined that Sayles was able to "follow and understand simple directions and instructions and perform simple rote tasks," but was limited in his ability to perform "complex tasks due to cognitive limitations."  Sayles could "maintain a regular schedule, make appropriate decisions, relate adequately with others, and deal appropriately with stress."  (Id.).  Dr. Helprin did not identify any "psychiatric problems that would significantly interfere with [Sayles'] ability to function on a daily basis."  (Id.).

Dr. Helprin diagnosed Sayles with "[a]djustment disorder with mixed anxiety and depressed mood," but noted that the condition was "controlled with medication."  (Id.).  She further noted that borderline intellectual functioning should be ruled out.  (Id. at 286).  Dr. Helprin recommended that Sayles continue the anti-depressant his general practitioner had prescribed, and that he "undergo vocational retraining" for a job that he could perform given the physical limitations that Dr. Philip had identified.  Dr. Helprin believed Sayles' prognosis was "good" if he followed her recommended treatments.  (Id.).

b.    Dr. A. Hochberg

On March 8, 2010, state agency psychologist A. Hochberg completed both a Psychiatric Review Technique and a Mental Residual Functional Capacity Assessment for Sayles.  (Id. at 304-21).  Dr. Hochberg noted that Sayles had an "Adjustment Disorder

17

with mixed anxiety and depressed mood." (<u>Id.</u> at 307).  Dr. Hochberg opined that Sayles

had mild restrictions in his activities of daily living, mild difficulties maintaining social

functioning, and moderate difficulties maintaining concentration, persistence or pace.  Dr.

Hochberg did not have sufficient evidence to assess whether Sayles had experienced

repeated episodes of deterioration.  (<u>Id.</u> at 314).  Dr. Hochberg also opined that the

evidence did not establish "the presence of the 'C' criteria." (<u>Id.</u> at 315).

   Dr. Hochberg believed that Sayles was not significantly limited in most

areas of functioning, but noted that he was moderately limited in his abilities to

understand, remember and carry out detailed instructions, maintain attention and

concentration for extended periods, complete normal work days and weeks without

interruptions from psychologically-based symptoms, perform at a consistent pace without

an unreasonable number or length of rest periods, respond appropriately to changes in the

work setting, and set realistic goals and make plans independently of others.  (<u>Id.</u> at 318-

19).  Dr. Hochberg opined that Sayles retained the "functional capacity to perform the

basic mental demands of unskilled work activity." (<u>Id.</u> at 320).

  C. <u>The ALJ's Decision</u>

   In a decision dated December 5, 2011, ALJ Gonzalez found that Sayles was

not disabled within the meaning of the Act, and therefore denied his claim for DIB.  (<u>Id.</u>

at 12-25).  In reaching that conclusion, the ALJ applied the five-step sequential analysis

required by 20 C.F.R. §§ 416.1520 and 416.920.

At Step One, the ALJ determined that although Sayles' certified earnings record showed some earnings after his alleged onset date, that activity did not rise to the level of substantial gainful activity.  (Id. at 17).

At Step Two, the ALJ found that Sayles had several severe impairments: asthma, Lyme disease, hypertension, left knee pain, morbid obesity, diabetes mellitus, and depressive disorder.  (Id.).  He concluded that although Sayles' medical records referenced a diagnosis of seizures, nothing in the record indicated that seizures were a problem, and Sayles had not claimed that his seizures were disabling.  (Id. at 19).   The ALJ further concluded that, although a doctor had noted the need to "rule out borderline intellectual functioning," and that Sayles might have "some cognitive limitations," this did not amount to a severe impairment because Sayles had "been able to work all along." (Id.).

Turning to Step Three of the analysis, the ALJ determined that although Sayles had several conditions that qualified as severe impairments under Step Two, no single impairment or combination of impairments "me[t] or medically equal[ed]" the relevant Listings.  (Id.).  The ALJ noted simply that Sayles' impairments were not "comparable in severity to the criteria as set forth in [L]istings 1.00, 3.00, 4.00, 9.00, 12.00 and 14.00."  (Id.).

At Step Four, the ALJ concluded that Sayles retained the residual functional capacity ("RFC") to perform sedentary work.  Specifically, ALJ Gonzalez concluded that

Sayles could "sit for 6 hours, stand and or walk for 2 hours and lift/carry items weighing ten pounds," and was limited to occasional crouching, crawling and climbing.  (<u>Id.</u>).  The ALJ noted that Sayles must "avoid concentrated exposure to respiratory irritants," and that he could "only understand, remember and carry out unskilled work tasks."  (<u>Id.</u>).  The ALJ therefore concluded that Sayles was unable to perform his past relevant work.  (<u>Id.</u> at 23).

Finally, turning to Step Five, the ALJ considered whether there were other jobs that existed in sufficient numbers in the national economy, consistent with Sayles' age, education, and work experience, that he could perform.  The ALJ concluded that transferability of job skills was "not material to the determination of disability" because the Medical-Vocational Rules supported a finding that Sayles was not disabled without regard for whether he had transferable job skills.  The ALJ consulted the Medical-Vocational Guidelines, often referred to as the "Grids," and noted that the Grids direct a finding of "not disabled" if the claimant has the RFC to perform the full range of sedentary work.  (<u>Id.</u> at 24).  ALJ Gonzalez concluded that Sayles' limitations, which required him to perform only "occasional crouching, crawling and climbing," to "avoid concentrate[d] exposure to respiratory irritants," and to "understand, remember and carry out [only] unskilled work tasks" had "little or no effect on the occupation base of unskilled sedentary work."  (<u>Id.</u>).

Based on all of these considerations, the ALJ concluded that Sayles was not disabled within the meaning of the Act.

III.   Discussion

A.   Standard of Review

Under Rule 12(c), judgment on the pleadings is appropriate when the material facts are undisputed and a party is entitled to judgment as a matter of law based on the contents of the pleadings.  See, e.g., Sellers v. M.C. Floor Crafters, Inc., 842 F.2d 639, 642 (2d Cir. 1988); Carballo ex rel. Cortes v. Apfel, 34 F. Supp. 2d 208, 213-14 (S.D.N.Y. 1999).

The Act, in turn, provides that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g); see Veino v. Barnhart, 312 F.3d 578, 586 (2d Cir. 2002); Perez v. Chater, 77 F.3d 41, 46 (2d Cir. 1996).  The term "substantial" does not require that the evidence be overwhelming, but it must be "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)).

A district court is not permitted to review the Commissioner's decision de novo.  Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004) (citing Schaal v. Apfel, 134 F. 3d 496, 501) (2d Cir. 1998)); Jones v. Sullivan, 949 F.2d 57, 59 (2d Cir. 1991).  Rather,

the court's inquiry is limited to ensuring that the Commissioner applied the correct legal standard and that his decision is supported by substantial evidence. See Hickson v. Astrue, No. CV-09-2049 (DLI) (JMA), 2011 WL 1099484, at *2 (E.D.N.Y. Mar. 22, 2011). When the Commissioner's determination is supported by substantial evidence, the decision must be upheld, "even if there also is substantial evidence for the plaintiff's position." Morillo v. Apfel, 150 F. Supp. 2d 540, 545 (S.D.N.Y. 2001).

      B.    Disability Determination

The term "disability" is defined in the Act as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 416(i)(1)(A). In determining whether a claimant is disabled, the Commissioner is required to apply the five-step sequential process set forth in 20 C.F.R. §§ 404.1520, 416.920. The Second Circuit has described that familiar process as follows:

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner] will consider him disabled without considering vocational factors such as age, education, and work experience. . . . Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the

> claimant's severe impairment, he has the [RFC] to perform his
> past work.  Finally, if the claimant is unable to perform his past
> work, the [Commissioner] then determines whether there is
> other work which the claimant could perform.

Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999) (quoting Berry v. Schweiker, 675 F.2d

464, 467 (2d Cir. 1982)); accord Draegert v. Barnhart, 311 F.3d 468, 472 (2d Cir. 2002).

      The claimant bears the burden of proof with respect to the first four steps of

the process.  Berry, 675 F.2d at 467.  If the Commissioner finds that a claimant is

disabled (or not disabled) at an early step in the process, she is not required to proceed

with any further analysis.  See 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); Williams v.

Apfel, 204 F.3d 48, 49 (2d Cir. 2000).  However, if the analysis reaches the fifth step of

the process, the burden shifts to the Commissioner to show that the claimant is capable of

performing other work.  DeChirico, 134 F.3d at 1180.

      In assessing whether a claimant has a disability, the factors to be considered

include:  "(1) the objective medical facts; (2) diagnoses or medical opinions based on

such facts; (3) subjective evidence of pain or disability testified to by the claimant or

other[s]; and (4) the claimant's educational background, age, and work experience."

Rivera v. Harris, 623 F.2d 212, 216 (2d Cir. 1980).

IV.    Application of Law to Facts

      Sayles contends that the ALJ's decision denying his claim for DIB benefits

is not supported by substantial evidence.  (ECF No. 18 ("Pl.'s Mem.") at 8-12, 15-16).

He maintains that the ALJ's determinations at Steps Four and Five are not supported by

substantial evidence, and that ALJ Gonzalez committed error by improperly analyzing Sayles' credibility.  (Id. at 8-16).  The Commissioner disputes these assertions, maintaining that the ALJ's findings are supported by substantial evidence and free of legal error.  (ECF No. 16 ("Comm'r's Mem.") at 2).  This requires the Court to consider the ALJ's reasoning under the five-step disability analysis.

A.   First Step

The first step of the sequential analysis requires the ALJ to determine whether the claimant has engaged in substantial gainful activity during the period at issue. 20 C.F.R. § 404.1520(a)(4)(i).  The ALJ determined that Sayles had not engaged in substantial gainful activity since the onset of his alleged disability in September 2007. (Tr. 17).  That finding benefits Sayles and is consistent with the evidence in this case.

B.   Second Step

The second step of the sequential analysis requires the ALJ to assess the medical severity of the claimant's impairments.  20 C.F.R. § 404.1520(a)(4)(ii).  An impairment is severe if it significantly limits the claimant's physical or mental ability to perform basic work activities.  Id. § 404.1520(c).  At this step, the ALJ does not take into consideration the claimant's age, education, or work experience.  Id.

ALJ Gonzalez determined that Sayles had several severe impairments: asthma, Lyme disease, hypertension, left knee pain, morbid obesity, diabetes mellitus,

and depressive disorder.  (Tr. 17).  These findings benefitted Sayles since they required

the analysis to proceed to Step Three.

      C.    <u>Third Step</u>

      The third step requires the ALJ to determine whether the claimant has an

impairment that meets or medically equals an impairment listed in Appendix 1, 20 C.F.R.

404, Subpt. P ("Appendix 1").  The ALJ must base this decision solely on medical

evidence, without regard to the claimant's age, education, or work experience.  <u>Id.</u>

§ 404.1520(d).  If the ALJ finds that the claimant has an impairment that meets or

medically equals an impairment listed in Appendix 1, the claimant is considered disabled

within the meaning of the Act.  <u>Id.</u> §§ 404.1520(a)(4)(iii), (d).  If the claimant's

impairment does not meet the criteria in Appendix 1, the ALJ must continue with the

five-step analysis.

      At this step, the ALJ noted simply that Sayles' impairments were not

"comparable in severity to the criteria as set forth in Listings 1.00, 3.00, 4.00, 9.00, 12.00

and 14.00."  Sayles does not challenge this determination.  Additionally, although the

ALJ did not provide any further analysis on this point, the brevity of his conclusion does

not, in and of itself, warrant remand.  As the Second Circuit has made clear, the ALJ need

not spell out his analysis with great detail, as long as one can clearly discern that there is

substantial evidence in the record to support his conclusion.  <u>See</u> <u>Salmini v. Comm'r of</u>

<u>Soc. Sec.</u>, 371 F. App'x 109, 112 (2d Cir. 2010) (citing <u>Berry</u>, 675 F.2d at 469); <u>Batista</u>

ex rel. M.B. v. Astrue, No. 08-CV-2136 (DLI), 2010 WL 3924684, at *7-9 (E.D.N.Y. Sept. 29, 2010) (affirming ALJ's finding that claimant did not meet or medically equal the relevant listed impairments, even though ALJ "did not specifically discuss the requirements" under those Listings).  A review of Sayles' medical history in conjunction with Appendix 1 confirms that the ALJ arrived at the correct conclusion.

### 1.    Listing 1.00:  Musculoskeletal System

Impairments of the musculoskeletal system are described in Section 1.00 of Appendix 1.  See Appendix 1 §§ 1.00-1.08.  The Listing relevant to Sayles' knee condition is Listing 1.02 (major dysfunction of a joint).  The conclusion that Sayles' alleged knee pain did not meet or medically equal that Listing is supported by substantial evidence.  To satisfy this Listing based on an impairment of "one major weight-bearing joint (i.e., hip, knee, or ankle)," a claimant must show that his knee impairment involves gross anatomical deformity; chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion; joint space narrowing, bony destruction or ankylosis,[6] as shown on medically acceptable imaging; and an inability to ambulate effectively.  Id. § 1.02(A).  In that regard, Sayles provided no evidence of any medically acceptable imaging of his knee.  Although Sayles testified that his knee had been x-rayed, the only documented indication that imaging was considered was Dr. Philip's referral for an x-ray

---

[6]    "Ankylosis" is defined as an "immobility and consolidation of a joint due to disease, injury, or surgical procedure."  Dorland's Illustrated Medical Dictionary 38 (27th ed. 1988).

which could not be completed because Sayles' weight exceeded the limitations of the table. (Tr. 275). Apart from that passing reference, there is no indication that Sayles ever had his knee examined in any detail by a treating physician or had any other type of imaging of it, such as an MRI. Additionally, Sayles has not shown that his knee condition resulted in an inability to ambulate effectively, defined as "having insufficient lower extremity functioning . . . to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities." Appendix 1 § 1.00(B)(2)(b)(1) (emphasis added). Although Sayles used a cane, it was not prescribed by a doctor, and his treating physician indicated only that the cane was used for balance. Sayles did not require two canes or a walker, and he did not use the cane at his consultative examination with Dr. Philip. (See Tr. 273). Accordingly, the determination that Sayles' knee problem did not meet or medically equal Listing 1.02 is supported by substantial evidence.

### 2.   Listing 3.00:  Respiratory System

To meet or medically equal the listing for asthma, a claimant must show "chronic asthmatic bronchitis" or a sufficient number of asthma "attacks." See id. §§ 3.00(C), 3.03. "Attacks" are defined as "prolonged symptomatic episodes lasting one or more days and requiring intensive treatment, such as intravenous bronchodilator or antibiotic administration or prolonged inhalational bronchodilator therapy in a hospital, emergency room or equivalent setting." Id. § 3.00(C).

27

The record does not support a finding that Sayles' asthma meets these requirements.  Sayles never was diagnosed with chronic asthmatic bronchitis.  Furthermore, he never was treated in a hospital setting for his asthma.  Accordingly, the ALJ's conclusion that Sayles' asthma did not meet or medically equal the Listings is supported by substantial evidence.

### 3.   Listing 4.00:  Cardiovascular System

Section 4.00 of Appendix 1 contains the Listings for impairments of the cardiovascular system.  See id. §§ 4.02-4.12.  Although the ALJ considered these listed impairments, none of the Listings pertaining to the cardiovascular system are relevant to Sayles' condition.  See id.  Accordingly, the ALJ's conclusion that Sayles' high blood pressure did not meet or medically equal these Listings is supported by substantial evidence.

### 4.   Listing 9.00:  Endocrine Disorders

Section 9.00 of Appendix 1 deals with endocrine disorders.  Such disorders, such as diabetes mellitus, are evaluated based on their effects on other body systems.  See id. § 9.00(A).  Where an endocrine disorder does not "have effects that meet or medically equal the criteria of any listing in other body systems," the analysis moves on to Step Four.  Id. § 9.00(C).  There is no evidence in the record to show that Sayles' diabetes had any effect on his other body systems, or that such an effect met or medically equaled any Listing.

5. <u>Listing 12.00:  Mental Disorders</u>

Mental disorders are addressed in Section 12.00 of Appendix 1.  The mental impairments potentially relevant to Sayles' condition are affective disorder (Section 12.04), "[c]haracterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome," and anxiety-related disorders (Section 12.06), characterized by conditions in which "anxiety is either the predominant disturbance or . . . is experienced if the individual attempts to master symptoms."  ALJ Gonzalez correctly found that Sayles' conditions did not manifest the requisite severity to meet the Listing criteria.

Section 12.04 requires medically documented evidence of both Paragraph A and Paragraph B criteria, or Paragraph C criteria alone.  To meet the Paragraph B criteria, the impairment must result in at least two of the following:  (a) "[m]arked restriction of activities of daily living;" (b) "[m]arked difficulties in maintaining social functioning;" (c) "[m]arked difficulties in maintaining concentration, persistence, or pace;" and (d) "[r]epeated episodes of decompensation, each of extended duration."  <u>Id.</u> § 12.04(B)(l)-(4).  A "marked" limitation is one that is "more than moderate but less than extreme."  <u>Id.</u> § 12.00(C).  There is no evidence that Sayles had marked limitations in his activities of daily living or his ability to maintain social functioning or concentration, persistence, or pace.  The record also includes no evidence of any episodes of decompensation.

To meet the Paragraph C criteria, there must be a "[m]edically documented history of a chronic affective disorder . . . and one of the following:  [a] [r]epeated episodes of decompensation, each of extended duration; or [b] residual disease process," such that "even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or [c] . . . inability to function outside a highly supportive living arrangement."  Id. § 12.04(C).  During the relevant period, there is no record that Sayles' limitations satisfied any of the alternative requirements of Paragraph C.

Section 12.06 requires medically documented evidence of both Paragraph A and Paragraph B criteria, or Paragraph A and Paragraph C criteria.  The Paragraph B criteria for anxiety-related disorders are the same as the Paragraph B criteria for affective disorders.  Accordingly, the ALJ's findings with respect to the Paragraph B criteria under Section 12.06 are supported by substantial evidence.

To meet the criteria for Paragraph C, the claimant's impairment must result in a "complete inability to function independently outside the area of one's home."  Id. § 12.06(C).  There is no evidence that Sayles was incapable of functioning independently outside his home due to his anxiety.  Accordingly, the ALJ's conclusion that Sayles' mental disorders did not meet or medically equal Listings 12.04 and 12.06 is supported by substantial evidence.

30

6.      Listing 14.00:  Immune System Disorders

Section 14.09 relates to inflammatory arthritis, a condition that may be caused by Lyme disease.  Id. § 14.00(D)(6)(c)(v).  For a claimant's condition to meet or medically equal this Listing, the medical evidence must show:  (a) persistent inflammation of one or more major peripheral joints hindering his ability to ambulate or perform fine and gross movements; (b) persistent inflammation in conjunction with moderate organ impairment or at least two constitutional symptoms (e.g., severe fatigue, fever, malaise, or involuntary weight loss); (c) fixation of the spine; or (d) repeated manifestations of inflammatory arthritis with at least two constitutional symptoms and marked limitation of daily living or social functioning.  Id. § 14.09.  There is no indication in the record that Sayles' Lyme disease resulted in any of these manifestations. The ALJ's conclusion that Sayles' Lyme disease did not meet or medically equal Listing 14.00 therefore is supported by substantial evidence.

In sum, ALJ Gonzalez's determination at Step Three finds substantial support in the record.  He thus properly proceeded to the fourth step of the sequential analysis.

D.      Fourth Step

At the fourth step, the ALJ must determine whether the claimant's impairments prevent him from doing his past relevant work, taking into consideration the claimant's symptoms to the extent that they are consistent with objective medical and

other evidence.  20 C.F.R. §§ 404.1520(a)(4)(iv), (e)-(f); 404.1560(b)(2).  In doing so, the

ALJ must determine the claimant's RFC, or what the claimant is able to do despite his

impairments.  Id. §§ 404.1524(a)(1), (3).  The ALJ's RFC analysis must "[s]et forth a

logical explanation of the effects of the symptoms, including pain, on the individual's

ability to work."  SSR 96-8p, 1996 WL 374184, at *7 (1996).  If the claimant can still

perform his past relevant work, the ALJ must find that the claimant is not disabled.  20

C.F.R. § 404.1520(a)(4)(iv).

       The analysis at this level involves a two-part inquiry.  First, the ALJ must

consider whether the claimant has a medically-determinable impairment that could

reasonably be expected to produce the pain or symptoms he alleges.  Sarchese v.

Barnhart, No. 01 Civ. 2172 (JG), 2002 WL 1732802, at *7 (E.D.N.Y. July 19, 2002)

(citing SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996)); 20 C.F.R. §§ 404.1529(b),

416.929(b).  Then, if the claimant makes statements about his symptoms that are not

substantiated by objective medical evidence, the ALJ must make a finding as to the

claimant's credibility and determine the extent to which his symptoms truly limit his

ability to perform basic work activities.  Sarchese, 2002 WL 1732802, at *7; SSR 96-7p,

1996 WL 374186, at *1.  A federal court must afford great deference to the ALJ's

credibility finding so long as it is supported by substantial evidence.  Bischof v. Apfel, 65

F. Supp. 2d 140, 147 (E.D.N.Y. 1999); see also Gernavage v. Shalala, 882 F. Supp. 1413,

1419 n.6 (S.D.N.Y. 1995) ("Deference should be accorded the ALJ's determination [as to

32

claimant's credibility] because he heard [claimant's] testimony and observed his demeanor.").

        1.   <u>Sayles' Credibility</u>

The ALJ found that Sayles' impairments could reasonably be expected to cause the symptoms alleged in his application, but that his statements concerning his symptoms' intensity, persistence, and limiting effects were "not credible to the extent they [were] inconsistent with the [RFC] assessment." (Tr. 23). In support of this credibility assessment, the ALJ noted that although Sayles told the consulting physician and psychologist that he was "severely limited in his ability to function at all," he told Dr. Smith just "shortly after" that he was "having no problems" and was "very busy, was physically active and was able to do car repairs, and was involved with his children and their activities." The ALJ also noted that Sayles was "found not to have clear evidence of Lyme disease." (<u>Id.</u> at 21). These factors suggested to the ALJ that Sayles' impairments were not as severe as he alleged. (<u>Id.</u>).

Sayles raises several challenges to the ALJ's credibility findings. First, Sayles contends that the ALJ erred in relying on Dr. Smith's account of Sayles as "a very busy person, physically active, and involved in car repairs and . . . with his children and their activities." (<u>Id.</u> at 21; 418). Sayles asserts that he testified at the hearing that these activities were "in the past." (Pl.'s Mem. at 13 (citing Tr. 46-47)).

The ALJ, however, was entitled to consider evidence of Sayles' self-contradictory statements in assessing his credibility.  See, e.g., Rutkowski v. Astrue, 368 F. App'x 226, 230 (2d Cir. 2010) (inconsistencies between claimant's pre-hearing statements and hearing testimony support ALJ's credibility determination);  Dumas v. Schweiker, 712 F.2d 1545, 1552-53 (2d Cir. 1983) (lack of evidence that claimant described to doctors the disabling level of pain to which he testified serves as substantial evidence supporting ALJ's conclusions).  Further, the ALJ was present at the hearing and therefore was able to assess Sayles' credibility during his testimony.  Sayles' simple assertion that his activities were "in the past" does not account for the fact that Dr. Smith came away from his March 18, 2010, examination believing that Sayles was "very physically active."  (Id. at 285, 418).[7]

Sayles also argues that it was not "suspicious" that he testified regarding his Lyme disease, as Dr. Smith himself stated that it is difficult to know whether a patient has the disease, and Sayles could only rely on what he was told by his doctors in concluding that he did.  It does not appear, however, that the ALJ relied on the mere fact that Sayles testified that he had Lyme disease as a basis for discounting his credibility.  Rather, the ALJ stated that Sayles' testimony that he was "debilitated from Lyme[] disease" was "not

---

[7]    Although the ALJ did not rely upon it, Sayles also told Dr. Taylor that he had not returned to work since beginning to take antibiotics on November 6, 2009.  (See Tr. 220, 224). This suggests that, contrary to his testimony, Sayles had been working in 2009.

supported by the records."  (Id. at 23) (emphasis added).[8]  Although the record included references to Sayles' headaches and muscle stiffness, there was no objective medical evidence showing the level of disability to which Sayles testified, and although Sayles indicated at the hearing that he "couldn't get out of bed" because of the ailment, there were no medical records to support his contention that his condition was that severe. Accordingly, it was not error for the ALJ to rely on the lack of clear evidence that Sayles experienced disabling effects of Lyme disease to conclude that his testimony was not entirely credible.

Sayles further objects to the ALJ's assertions that the record suggested that Sayles was "very active" and that he "appear[ed] to be capable of doing more than he testified."  (Pl.'s Mem. at 14 (citing Tr. 21, 23)).  Sayles contends that the medical evidence was, in fact, consistent with his account that he had difficulty walking and spent most of his time doing sedentary activities like watching television.  (Id.).  Although the assertion that Sayles was "very active" might be an overstatement, the ALJ's RFC

---

[8]     The ALJ may have misunderstood the significance of the July 2010 blood tests. In his decision, the ALJ stated that Sayles' "Lyme[] disease was barely detectable now."  (Id.). The July 2010 blood tests results did not show "barely detectable" levels of Lyme disease, nor did Dr. Smith assert as much.  Instead, the blood tests show that Sayles may or may not have had Lyme disease.  See Centers for Disease Control and Prevention, Lyme Disease, http://www.cdc.gov/lyme/diagnosistesting/LabTest/ TwoStep/WesternBlot/index.html (last visted Aug 27, 2014) ("It is not correct to interpret a test result that has only some bands that are positive as being 'mildly' or 'somewhat' positive for Lyme disease.").  Dr. Smith believed that Sayles' blood test showed a false positive.  (Id. at 408).  The correct interpretation of the blood tests and Dr. Smith's findings, however, have little or no bearing on the ALJ's credibility determination, as it was based instead on the inconsistency between Sayles' testimony as to the debilitating effects of his symptoms and the medical records, not the ultimate diagnosis.

assessment alone shows that he acknowledged that Sayles had some significant restrictions.  Accordingly, in context, the ALJ's reference to Dr. Smith's entry plainly served simply to underscore that Sayles was more capable than his testimony suggested. The record contains substantial evidence to support this conclusion.  Indeed, in addition to Dr. Smith's statement that Sayles was "a very busy person [and was] physically active," (Tr. 408), Dr. Philip reported that Sayles did not use any assistive devices, and did not need help changing for the examination or getting on or off the examination table. Indeed, at that examination, Sayles was "able to rise from [a] chair without difficulty." (Id. at 54, 273).

Finally, Sayles contends that the ALJ should have considered his strong work history when assessing his credibility.  (Pl.'s Mem. at 15).  To be sure, "a good work history may be deemed probative of credibility."  Schaal, 134 F.3d at 502.  Indeed, "[a] claimant with a good work record is entitled to substantial credibility when claiming an inability to work because of a disability."  Rivera v. Schweiker, 717 F.2d 719, 725 (2d Cir. 1983).  However, a positive work history is "just one of many factors" that an ALJ should consider in assessing credibility.  Schaal, 134 F.3d at 502.  Here, the ALJ provided other valid reasons for discounting Sayles' credibility.  The fact that Sayles previously had demonstrated a strong work ethic does not so significantly bolster his credibility as to overcome the other factors weighing against a finding that his testimony was credible.

In sum, the ALJ's credibility determination finds substantial support in the record.  The ALJ thus reasonably discounted Sayles' subjective complaints regarding the limiting effects of his impairments.

2.    Sayles' RFC

After considering all of the objective medical evidence and appropriately rejecting certain of Sayles' subjective complaints, the ALJ went on to conclude that Sayles retained the RFC to perform sedentary work with no concentrated exposure to respiratory irritants, and that he was limited to only unskilled work.  In reaching this conclusion, the ALJ gave "some weight" to the opinions of the consultative examiners, and gave "significant weight" to the opinion of Sayles' treating physician, Dr. Goldman, and NP Goldman, except that he found that Sayles had a "greater ability for crouching and crawling" than they assigned to him, "based on the minimal objective findings in the record."  (Tr. 23).

Sayles contends that the ALJ erred at this stage because (a) he failed to note that the reason there were "minimal objective findings in the record" regarding his ability to crouch and crawl was "partially due to [Sayles'] obesity," (b) the record supported Dr. Goldman's and NP Goldman's assessment that Sayles could "never" crouch or crawl, and (c) despite assigning significant weight to the opinions of Dr. Goldman and NP Goldman, the ALJ did not include, or explain why he excluded, certain limitations those practitioners identified in his RFC determination.  (Pl.'s Mem. at 9-12).

Sayles' first two arguments are unavailing.  First, Sayles cites SSR 96-7p for the proposition that "the adjudicator must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment."  (Id. at 9).  Sayles argues that the ALJ should have considered the explanation that his obesity stood between him and "objective findings."  (Id.).  Although it is true that Sayles' obesity appears to be the reason that no x-ray of his knee was taken, it does not account for the fact that Sayles never consulted any doctor, much less a specialist, about what the ALJ repeatedly described as an "amazing symptom" – the protrusion of soft tissue from his knee after minimal walking, which he could rub and push back into place.  (See, e.g., Tr. 50).  It is clear from the hearing transcript that the ALJ was troubled by this alleged problem that not one doctor had documented.  Accordingly, although obesity hindered Sayles' ability to receive some level of treatment and diagnostic tests, it cannot account for the utter lack of objective medical evidence in the record.  Because Sayles' obesity does not provide an adequate explanation for the lack of objective medical findings in the record, the ALJ was entitled to rely on the absence of such findings in coming to his conclusions.  See, e.g., Martin v. Astrue, 337 F. App'x 87, 89 (2d Cir. 2009) ("a lack of evidence of severe impairment constitutes substantial evidence supporting a denial of benefits"); Casino-Ortiz v. Astrue,

No. 06 Civ. 0155 (DAB) (JCF), 2007 WL 2745704, at *10 (S.D.N.Y. Sept. 21, 2007), report and rec. adopted, 2008 WL 461375 (S.D.N.Y. Feb. 20, 2008) (ALJ may "rely upon the absence of evidence" at Step Four).  Further, there is no basis for the contention that the ALJ ignored Sayles' obesity or the effects it might have on his ability to receive treatment or diagnoses.  In fact, the ALJ specifically noted that he had considered the effect of Sayles' obesity in relation to his RFC determination.  (Id. at 23).

Second, Sayles' argument that the record supported his physicians' opinion that he could never crouch or crawl ignores the standard of review at the present stage. When the Commissioner's determination is supported by substantial evidence, the decision must be upheld, "even if there also is substantial evidence for the plaintiff's position." Morillo v. Apfel, 150 F. Supp. 2d 540, 545 (S.D.N.Y. 2001).  There is substantial evidence in the record to support the ALJ's determination.  Dr. Philip noted that Sayles did not need help changing for the consultative examination or getting on or off the examination table.  He also was "able to rise from [a] chair without difficulty" and, although he had a positive straight-leg raising test on the left in one position, his strength was 5/5 in his right leg and 4/5 in his left.  (Tr. 273-74).  Accordingly, the Commissioner's decision cannot be set aside simply because there is evidence in the record that could support another conclusion.[9]

---

[9]     For reasons set forth below, however, the case should be remanded so that the ALJ can make further determinations.  In light of those determinations, the ALJ also would be well advised to set forth greater detail concerning Sayles' ability to crouch or crawl.

Finally, Sayles argues that the ALJ should have incorporated into his RFC analysis Dr. Goldman's opinion and that of NP Goldman that Sayles should "never stoop or kneel," needed a "combination of sitting and standing for short intervals," and should "never" be exposed to humidity, wetness, or extreme temperatures.  In his view the ALJ, at the very least, should have explained why he did not incorporate these opinions into his analysis.  (Id. at 438-39; Pl.'s Mem. at 11-12).

To the extent the ALJ failed to address Sayles' ability to kneel or tolerate exposure to humidity, wetness, or extreme temperatures, those oversights amount to harmless error.  See Duvergel v. Apfel, No. 99 Civ. 4614 (AJP), 2000 WL 328593, at *11 (S.D.N.Y. Mar. 29, 2000) (harmless error analysis applies to review of disability determinations).  The ALJ found that Sayles was limited to sedentary work, which does not require kneeling.  See SSR 96-9p, 1996 WL 374185, at *7 (July 2, 1996) ("Postural limitations or restrictions related to such activities as climbing ladders, ropes, or scaffolds, balancing, kneeling, crouching, or crawling would not usually erode the occupational base for a full range of unskilled sedentary work significantly because those activities are not usually required in sedentary work.").  Additionally, "few occupations in the unskilled sedentary occupational base require work in environments" with exposure to humidity, wetness, or extreme temperatures.  SSR 96-9p, at *9.  The ALJ's failure to address Sayles' ability to tolerate these conditions thus had no effect on the ultimate disability determination.

40

The ALJ, however, made no finding whatsoever as to Sayles' ability to stoop.  Although the ALJ need not conduct an exhaustive "function-by-function" assessment where it would be "unnecessary or superfluous," "[r]emand may be appropriate . . . where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record."  Cichocki v. Astrue, 729 F.3d 172, 177 (2d Cir. 2013).  Sayles' treating physicians opined that he could "never" stoop. (Tr. 438).  This opinion is consistent with record evidence that Sayles used a cane for balance, "defer[red] to walk on [his] heels and toes [and] to squat" during his consultative examination, and had decreased strength and range of motion in his knee.  (See, e.g., id. at 274, 436, 478).  A complete inability to stoop would "significantly erode the unskilled sedentary occupation base," warranting consultation with a vocational resource.  SSR 96-9p, at *8; Bapp v. Bowen, 802 F.2d 601, 605 (2d Cir. 1986).  By comparison, a "restriction to occasional stooping" would "by itself, only minimally erode the unskilled occupation base of sedentary work," and therefore would not require the testimony of a vocational expert.  SSR 96-9p, at *8; Bapp, 802 F.2d at 605.  Accordingly, a finding on this point is vital to the disability determination.  The case therefore should be remanded so that the ALJ can make a finding as to Sayles' ability to stoop.

Additionally, the ALJ's failure to address – even if only to discount – Dr. Goldman's opinion that Sayles required a combination of sitting and standing in short intervals warrants remand, as "alternating between sitting and standing may not be within

the concept of sedentary work." <u>Ferraris v. Heckler</u>, 728 F.2d 582, 587 (2d Cir. 1984)

(citing <u>Deutsch v. Harris</u>, 511 F. Supp. 244, 249 (S.D.N.Y. 1981)).[10]

>    3.    <u>Ability to Perform Past Relevant Work</u>

After concluding that Sayles had the RFC to perform sedentary work with

no concentrated exposure to respiratory irritants and was limited to only unskilled work,

the ALJ went on to consider as part of Step Four whether Sayles could perform his past

relevant work as an auto mechanic or armored car guard.  Given his assessment that

Sayles was limited to sedentary work, the ALJ properly determined that Sayles was not

able to perform his past work because it "required a much greater [RFC]."  (Tr. 23).  He

thus proceeded to the fifth step of the sequential analysis.

>    E.    <u>Fifth Step</u>

At the fifth step, the ALJ must assess the claimant's RFC and determine

whether, based on the claimant's age, education, and work experience, the claimant could

"make an adjustment to other work."  20 C.F.R. § 404.1520(a)(4)(v).  As part of this

analysis, the ALJ must determine whether there are jobs in the national economy that the

claimant could perform.  SSR 83-10, 1983 WL 31251, at *4 (1983).  In an "ordinary

case," when the claimant has only exertional limitations,[11] the ALJ may meet this burden

---

>    [10]    In addition, as noted above, (<u>see</u> n.9), the ALJ, on remand, would be well advised
to set forth in greater detail his findings concerning Sayles' ability to crouch or crawl.

>    [11]    "Exertional limitations" are defined as "limitations and restrictions imposed by [a
claimant's] impairment(s) and related symptoms" that affect the claimant's "ability to meet the
>                                                        (continued...)

by applying the Medical-Vocational Guidelines, also known as the Grids.  Bapp, 802 F.2d at 604; see also SSR 83-11, 1983 WL 31252, at *1 (1983) (Grids may be used to direct conclusion of "disabled" or "not disabled" only when criteria of a rule in the Grids are "exactly met").  When a claimant also has nonexertional limitations, the ALJ, in certain situations, cannot satisfy this burden through use of the Grids alone, and must instead consider the testimony of a vocational expert.  Bapp, 802 F.2d at 605-07.  However, "the mere existence of a non-exertional impairment does not automatically preclude reliance on the guidelines."  Zabala v. Astrue, 595 F.3d 402, 410-11 (2d Cir. 2010) (citing Bapp, 802 F.2d at 603).  Only where the non-exertional limitations significantly erode the occupational base available to the claimant does the testimony of a vocational expert become necessary.  See Bapp, 802 F.2d at 605.

The ALJ in this case found that Sayles' non-exertional impairments would have "little or no effect on the occupational base of unskilled sedentary work."  (Tr. 24). He therefore determined that a finding of "not disabled" was appropriate based on the Grids.

Sayles contends that the ALJ should have consulted with a vocational expert to determine the extent to which his non-exertional impairments eroded his

---

[11](...continued)
strength demands of jobs (sitting, standing, walking, lifting, carrying, pushing, and pulling)." 20 C.F.R. § 404.1569a(b).  "Nonexertional limitations" are defined as those that "affect only [a claimant's] ability to meet the demands of jobs other than the strength demands," and include a claimant's ability to "perform the . . . postural functions of some work such as . . . stooping." 20 C.F.R. § 416.969a(c)(1)(vi).

occupational base.  (Pl.'s Mem. at 15-16).  If the case is remanded for the ALJ to make further determinations regarding Sayles' ability to stoop, crouch or crawl, and his need to alternate between sitting and standing, the ALJ may need to reconsider his determination at Step Five in light of the ultimate outcome at Step Four.  Were the ALJ to conclude that Sayles could never stoop, for example, such a limitation would significantly erode the unskilled, sedentary occupational base such that consultation with a vocational expert would be warranted.

V.     Conclusion

            For the foregoing reasons, the Court should deny the Commissioner's motion for judgment on the pleadings, (ECF No. 15), and grant Sayles' cross-motion for judgment on the pleadings, (ECF No. 17).  Furthermore, the case should be remanded pursuant to the fourth sentence of 42 U.S.C. § 405(g) for further proceedings.

VI.    Notice of Procedure for Filing of Objections to this Report and Recommendation

            The parties shall have fourteen days from service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure.  See also Fed. R. Civ. P. 6(a) and (d).  Any such objections shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable Richard J. Sullivan at the Thurgood Marshall United States Courthouse, 40 Foley Square, New York, New York 10007, and to the chambers of the undersigned at the United States Courthouse, 500 Pearl Street, New York, New York

10007, and to any opposing parties. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d),

72(b). Any requests for extension of time for filing objections must be directed to Judge

Sullivan. The failure to file these timely objections will result in a waiver of those

objections for purposes of appeal. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d),

72(b); Thomas v. Arn, 474 U.S. 140 (1985).

SO ORDERED.

Dated:     New York, New York
           August 28, 2014

_____
FRANK MAAS
United States Magistrate Judge


Copies to all counsel via ECF

45